WAGNER CHOI & VERBRUGGE

CHUCK C. CHOI
ALISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96817
Telephone: (808) 533-1877
Facsimile: (808) 599-6900
Email: cchoi@hibklaw.com

Attorneys for Debtor
And Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>JAXA HOLDINGS, LLC,<br>a Hawaii limited liability company,<br><br>        Debtor and<br>        Debtor-in-possession | Case No. 09-02660<br>(Chapter 11)<br><br>Date:<br>Time:<br>Judge: Hon. Robert J. Faris |

## DEBTOR'S MOTION TO DISMISS
## CHAPTER 11 CASE; EXHIBITS "A" AND "B"

Jaxa Holdings, LLC, debtor and debtor-in-possession (the "Debtor" or

"Jaxa"), by and through its undersigned counsel, hereby respectfully moves this

Court for an order dismissing the Debtor's Chapter 11 proceeding.

This motion (the "Motion") is made pursuant to 11 U.S.C. §§ 105 and 1112, Federal Rules of Bankruptcy Procedure Rules 1017 and 2002, the Declaration of Jerry A. Ruthruff, the records and files herein and such other matters as may come before the court at the hearing on this Motion. In support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3. Jon Anderton was the president, general manager and sole owner of Exchange Accommodators, Inc. ("EAI"), which was engaged in the business of acting as exchange intermediary for real estate transactions intended to qualify as tax deferred exchanges pursuant to Section 1031 of the Internal Revenue Code.

4. EAI entered into exchange contracts with customers. These contracts required EAI to (1) deposit and hold funds it received from the sale of its customer's relinquished properties ("Exchange Proceeds") in a federally insured bank account, (2) use each customer's Exchange Proceeds solely for the purchase of replacement property designated by that customer, and (3) if and to the extent

the customer did not use all of his/her Exchange Proceeds for the purchase of replacement properties, to pay any unexpended portion of a customer's Exchange Proceeds to that customer.

5.     In 2007 and 2008, EAI and Anderton were using most or all of the Exchange Proceeds received from the sale of customers' relinquished properties, for unauthorized purposes and were therefore unable to fulfill EAI's obligations to customers' Exchange Proceeds for the purchase of replacement property designated by that customer and/or to pay the unexpended portion of said Exchange Proceeds to customers to the extent that customers did not use all of their Exchange Proceeds for the purchase of replacement properties.

6.     At the request of Jamie Wallace, one of the exchange creditors of EAI and Anderton, Jerry Ruthruff was appointed the trustee of a trust created for the benefit of the exchange creditors of EAI and Anderton, which trust agreement was amended on December 31, 2008 by that certain Amended and Restated Trust Agreement (the "Trust Agreement"). Jamie Wallace, Vance Collins, TLG Enterprises, Andre Rigoli, Ming Fang, and Solar Wong/Douglas Wong (six of the eight exchange creditors of EAI and Anderton) joined as parties to the Trust Agreement and another exchange creditor (Robert Patey) has subsequently agreed to accept distributions in settlement of his claims, as if he were a party to the Trust

Agreement. A true and correct copy of the Trust Agreement is attached hereto as Exhibit "A."

7.     Pursuant to the Trust Agreement, substantially all of the assets of EAI and Anderton were transferred to Ruthruff as Trustee and/or to Jaxa Holdings, LLC, a limited liability company owned and managed by Ruthruff as Trustee, to hold trust assets for distribution to creditors. The only assets of the Debtor are the assets that were transferred to it by EAI and Anderton.

8.     Pursuant to the terms of the Trust Agreement, the fees of Jerry Ruthruff are limited to ten percent (10%) of the amount distributed to the creditors of EAI and Anderton.

9.     In that Jerry Ruthruff is an attorney, he was able to personally handle the collection of assets received from EAI and Anderton and the lawsuits filed by Thomas Lefler (*Thomas C. Lefler vs. Exchange Accommodators, Inc.; Hawaii Shared Ownership, Inc., Jon Anderton, et al*; Civil No. 08-1-0653-03 filed in the Circuit Court of the Second Circuit, State of Hawaii) and the two lawsuits filed by Robert Patey in the Fifth Circuit Court (Civil No. 09-1-0020, *Robert Patey vs. Jon Anderton et al.* and Civil No. 09-1-0215, *Robert Patey vs. Jerry Ruthruff, Jaxa Holdings, LLC et al.* instead of retaining counsel. Consequently, the total legal and administrative expenses of the trust established for the benefits of EAI and Anderton will only approximately 11% of the amount distributed to creditors,

which is far less than if Jerry Ruthruff, as Trustee, had hired counsel to defend the claims and litigation involving the trust assets.

10. On July 15, 2009, the Circuit Court of the Fifth Circuit entered summary judgment in Civil No. 09-1-0020, *Robert Patey vs. Jon Anderton et al.* pursuant to which Patey was awarded damages in the amount of $554,909.04 (principal amount), together with prejudgment interest of $103,228.28, attorneys' fees and costs against EAI and Anderton.

11. On July 21, 2009, in Civil No. 09-1-0020, Patey, Anderton and EAI entered into the *Stipulated HRCP 4(B) Final Judgment For Monetary Damages, Attorneys' Fees Costs and Interest* in the total amount of $784,262.05 plus interest of $152.03 from June 9, 2009, which includes principal of $554,909.54, interest of $103,228 through June 9, 2009 and attorneys' fees and costs totaling $126,124.70.

12. On August 12, 2009, Patey commenced Civil No. 09-0215 in the Circuit Court of the Fifth Circuit against Jerry Ruthruff, Jaxa Holdings, LLC, et al. contending that the transfer of assets to Jaxa, et al. were fraudulent transfers as defined in Hawaii Revised Statutes Chapter 651-C (the "Fifth Circuit Action").

13. On October 1, 2009 Patey filed a *Motion for Summary Judgment* ("MSJ") in the Fifth Circuit Action and, at an October 27, 2009 hearing, Judge Watanabe orally granted the MSJ, wherein Patey sought, *inter alia*, an order voiding the transfers of assets by EAI and Anderton to Ruthruff and Jaxa.

14.     On November 15, 2009 (the "Petition Date"), the Debtor filed an emergency voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Hawaii (the "Court") and attempted to notify Patey and the Fifth Circuit Court of the bankruptcy filing.

15.     Nevertheless, on November 17, 2009, the Fifth Circuit Court entered *Findings of Fact, Conclusions of Law and Order Granting Plaintiff Robert Patey's Motion for Summary Judgment* in the Fifth Circuit Action.

16.     On December 15, 2009, the Debtor filed its *Schedules and Statement of Financial Affairs*. *See* Docket # 8. The Debtor's primary assets consist of real property on Molokai, valued at approximately $325,000, and stock in a Mid-Pacific Communications, Inc., which Anderton purchased for almost $2,000,000 and which may have a substantial value when the company goes public or is sold.

17.     Since the Petition Date, the Debtor has engaged Patey about a settlement that would resolve the Patey's Fifth Circuit Action.

18.     On February 11, 2010, Patey, Ruthruff and Jaxa entered into a Settlement Agreement (the "Patey Settlement"), a true and correct copy of which is attached hereto as Exhibit "B." The Patey Settlement is conditioned upon dismissal of this Chapter 11 case and the sale of the Debtor's property on Molokai.

19. The sale of the property on Molokai will also resolve the lawsuit and claims in *Thomas C. Lefler vs. Exchange Accommodators, Inc., Hawaii Shared Ownership, Inc., Jon Anderton, et al*; Civil No. 08-1-0653-03 filed in the Circuit Court of the Second Circuit, State of Hawaii, which is also conditioned upon dismissal of this Chapter 11 case.

20. Upon dismissal of this case, the only remaining claim or dispute involving the Debtor will be lawsuit filed by Ronald K. Kotoshirodo, as trustee of the bankruptcy estate of James Lull (the "Lull Trustee").

21. On November 18, 2008, the Lull Trustee sued Anderton and EAI, Case No. 06-00898, in this Court alleging, *inter alia*, that the payments of approximately $2.3 million which Anderton and EAI received from James Lull as the partial repayment of advances made by Anderton to James Lull, were fraudulent transfers in that Anderton knew, or had reason to know, that James Lull was engaged in a Ponzi scheme.

22. The Lull Trustee's complaint was subsequently amended to include claims against the Debtor, Jerry Ruthruff, as Trustee and others, alleging *inter alia*, that the transfers of assets by Anderton and EAI to Ruthruff for the benefit of their creditors were fraudulent transfers in that they were made with actual intent to actually hinder, delay or defraud Anderton's creditors, including the Lull Trustee.

23.  Anderton, EAI, Debtor and Ruthruff deny the allegations of the Lull Trustee's Complaint, as amended, and intend to take all necessary and appropriate actions to defend themselves against these allegations.

24.  The Debtor has reached an agreement in principle with counsel for the Lull Trustee to settle the Lull Trustee's action but the parties have not yet been able to agree on the final language and terms of the proposed settlement. If that case cannot be settled, the Debtor is prepared to defend that claim.

## ARGUMENT

**A.     Dismissal is appropriate under Bankruptcy Code Section 1112.**

25.  Bankruptcy Code Section 1112 provides in relevant part as follows:

> (b) (1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104 (a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes *cause*.

11 U.S.C. § 1112(b)(1) (emphasis added). *See also* 11 U.S.C. § 1112(b)(3) (requiring courts to hold hearing on dismissal motion within 30 days of filing of motion and rendering a decision within 15 days of commencement of the hearing)

26.     Cause exists to dismiss the Debtor's case under Section 1112 of the Bankruptcy Code.   The Trust Agreement is essentially an assignment for the benefit of the exchange creditors of EAI and Anderton.   However, Robert Patey, one of the two exchange creditors who did not sign the Trust Agreement, pursued litigation against the Debtor which triggered this bankruptcy filing.   Now that the Patey Settlement is in place, the Debtor believes that it is in the best interest of the estate and its creditors to dismiss this case, rather than for the Debtor to continue to incur the substantial fees and expenses by remaining in a Chapter 11 proceeding.

## CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court enter an order: (a) dismissing this chapter 11 proceeding; and (b) granting any other and further relief that this Court deems just and proper.

DATED:     Honolulu, Hawaii, February 19, 2010.


Respectfully submitted,


/s/ Chuck C. Choi
CHUCK C. CHOI
Attorneys   for   Debtor   and   Debtor-in-Possession

## AMENDED AND RESTATED TRUST AGREEMENT

This Amended and Restated Trust Agreement ("Trust Agreement") is made on December **31**, 2008 by EXCHANGE ACCOMMODATORS INC., a Hawaii corporation of Princeville, Hawaii and JON F. ANDERTON ("Anderton") of Anahola, Hawaii, (collectively referred to herein as "Debtors"), JERRY A. RUTHRUFF of Honolulu, Hawaii, ("Trustee"), and JAMIE WALLACE ("Wallace") of Hilo, Hawaii and each of the persons listed in Paragraph 16 herein A who agree in writing as provided herein to be a party this Trust Agreement.

PRELIMINARY STATEMENT

A.     Debtors are indebted to Wallace and the other persons listed in Paragraph 16 herein (hereinafter collectively referred to as "Exchange Clients") in connection with uncompleted exchange transactions and are presently unable to pay the amounts owed to Exchange Clients.

B.     Debtors desire that Exchange Clients be treated in a fair and equitable manner and have conveyed substantially all of their assets to Trustee with the intention that the debts which they owe to Exchange Clients shall, if possible, be paid in full and that Exchange Clients shall receive additional amounts to compensate them for interest, tax losses, attorney's fees and other damages suffered as a result of Debtors' inability to pay all amounts owed to or for the benefit of Exchange Clients in full on a timely basis.

C.     In order to avoid the legal fees and expenses likely to result in litigation against or a bankruptcy proceeding involving Debtors, to avoid the low liquidation values typically realized in a bankruptcy proceeding and to maximize the amount that Exchange Clients will receive from the liquidation and sale of Debtors' assets, Debtors, Wallace and Trustee have agreed to enter into this Trust Agreement and to allow other Exchange Clients the option of becoming parties hereto.

NOW THEREFORE Debtors, Trustee, Wallace and any other Exchange Clients listed in Paragraph 16 who execute this Amended and Restated Trust Agreement ("Trust Agreement"), all agree as follows:

1.     <u>Joinder By Exchange Clients</u>.     Each of the Exchange Clients shall have until January 15, 2009 to execute a copy of this Trust Agreement and thereby become a party hereto as of that date (the "Effective Date").  If an Exchange Client executes this Trust Agreement as aforesaid by said date, said Exchange Client shall be a party to this Trust Agreement, and shall thereby be bound by and entitled to the benefit of the terms and conditions thereof, including specifically the right to receive distributions under this Trust Agreement in respect to the amounts due to them as set forth in paragraphs 16 through 18 herein.  In the exercise of his discretion, Trustee may extend the time within which an Exchange Client may execute a copy of and become be a party to this Trust

## EXHIBIT A

Agreement. Wallace and all Exchange Clients who execute this Agreement as provided herein, are hereinafter collectively referred to as "Exchange Creditors."

2. <u>Acknowledgement of Indebtedness</u>. Debtors acknowledge and agree with and for the benefit of each Exchange Creditor, that Debtors are jointly and severally indebted to each of the Exchange Creditors for:

(i) the principal sum set opposite to their respective names in the schedule set forth in Paragraph 16 herein;

(ii) consequential damages equal to any state and federal income taxes that Exchange Creditors have paid and/or are obligated to pay as a result of Debtors inability to pay the amounts owed to or with respect to Exchange Creditors and/or the purchase of Exchange Creditor's replacement properties on a timely basis and Exchange Creditor's delayed receipt of the Creditor's principal from Trustee (hereinafter referred to as "tax losses");

(iii) interest at ten percent (10%) per annum on the net amount held and/or owing from time to time by Debtors to each Exchange Creditor with respect to  proceeds received by Debtors from the sale of said Exchange Creditor's relinquished property less disbursements made by Debtors to or for the benefit of said Exchange Creditor (hereinafter referred to as "interest"); and

(iv) Exchange Creditor's attorney's fees and costs incurred to date as a result of Debtors' breach of their obligations to Exchange Creditor which are reasonable in amount and were reasonably necessary under the circumstances (hereinafter referred to as "attorney's fees").

3. <u>Amounts Owed to Exchange Creditors</u>. If Trustee or any Exchange Creditor contends that the amount listed in Paragraph 16 with respect to said Exchange Creditor is incorrect, Trustee and Exchange Creditor shall attempt to reconcile any differences between the records of Exchange Creditor and those of Debtors and to agree in writing as to the amount owed to Exchange Creditor. If and to the extent that Trustee and any Exchange Creditor are unable to resolve any such disagreement to their mutual satisfaction, the dispute shall be submitted to binding arbitration pursuant to the procedures as hereinafter set forth. The amount owed to each Exchange Creditor as listed in Paragraph 16 (as same may hereinafter be modified by agreement or arbitration) shall be referred herein as "the Creditor's Principal."

4. <u>Interest, Tax Losses and Attorney's Fees</u>. When so requested by the Trustee, each of the Exchange Creditors shall provide Trustee with a schedule which sets forth the basis for said Exchange Creditor's calculation as to interest, tax losses and attorney's fees incurred by and/or owed to said Exchange Creditor, all of which amounts shall be subject to verification and approval by Trustee. If and to the extent that Trustee and any Exchange Creditor are unable to resolve any disagreement as to

said interest, tax losses and/or attorney's fees, the dispute shall be submitted to binding arbitration pursuant to the arbitration procedures hereinafter set forth.

5. <u>Information to Exchange Creditors</u>. After the expiration of the period for all Exchange Creditors to join in this Trust Agreement has expired, Trustee shall provide each of the Exchange Creditors and Debtor with a list of the Exchange Creditors and the principal amounts owed thereto as provided in this Trust Agreement. After the Trustee and all Exchange Creditors have reached agreement and/or resolved any disagreement as to interest, tax losses and attorney's fees, Trustee shall provide each of the Exchange Creditors and Debtor with a list of the additional amounts owed to each Exchange Creditor with respect to interest, tax losses and attorney's fees.

6. <u>Debtors' Transfer of Assets to Trustee</u>. Debtors have conveyed, transferred and assigned to Trustee, his successors and assigns, all real, tangible, intangible and personal property owned by and/or in which Debtors have any interest, and/or to which either or both of the Debtors is legally, equitably and/or beneficially entitled, either in possession, reversion, remainder or expectancy, including but not limited to, those assets listed in Exhibit A attached to and made a part of this document collectively hereinafter referred to as the "Trust Property"), to hold same for the use of Trustee, his successors and assigns, according to the nature and tenure of the  assigned property for the benefit of the Exchange Creditors as herein set forth. Debtors represent that all of their assets having a value in excess of ten thousand dollars ($10,000) are listed on Exhibit A. Debtors agree to execute such conveyances, assignments and similar documents which Trustee may reasonably request and to provide Trustee with copies of and access to all books, files and records relating to (i) transactions with and amounts owed to Exchange Creditors, (ii) any Trust Property and (iii) transactions with third parties that Trustee may wish to review.

7. <u>Debtors' Grant of Power of Attorney</u>. Debtors appoint Trustee to be their true and lawful attorney, in their names and on their behalf to execute, sign and deliver any deed, bill of sale, assignment, stock power, compromise or settlement agreement or other document or agreement which Trustee may think necessary or expedient for carrying into effect the trust and purposes of this Trust Agreement. This power of attorney is intended to be and shall be a general power of attorney and is coupled with an interest and cannot be revoked, restricted, altered or amended prior to the expiration of this Trust Agreement without the written consent of Trustee. In addition to and notwithstanding the foregoing, Debtors shall also sign all reasonable and necessary written instruments and do all similar things that Trustee may deem necessary or advisable to enable Trustee to fully carry out the purposes for which this Trust Agreement is made.

8. <u>Trustee's Receipt, Collection and Sale of Trust Property</u>. Trustee shall take ownership and/or possession of the Trust Property; collect and compel payment of all property, accounts, and credits of Debtors at such time or times and in such manner, as he shall determine to be in the best interests of the Exchange Creditors, sell and convert into money all of the Trust Property to the extent practicable, receive, collect

3

and compel payment at the proper time of debts and obligations owed to Debtors and proceeds of insurance policies, or other evidences of money owing to Debtor, all at such time as is consistent with reducing the same to money as soon as this can be wisely done. All property and moneys which shall come to the hands of Trustee as shall by this Trust Agreement be conveyed to and held by Trustee in trust (subject to payment of such sums if any, as may be due to encumbrances), by virtue of the trusts and powers contained in this document.

9. <u>Open Book Policy</u>. Trustee shall have an "open book" policy wherein Trustee will make as much information concerning the collection, administration and sale of Trust Property available to Exchange Creditors, Debtors and their respective attorneys as is reasonable and practicable under the circumstances. In the case of confidential or non-public information (such as relating to the business or stock of MPC and the limited liability companies which own stock in MPC or negotiations or plans as to the sale of assets), the Trustee may require that the parties execute a confidentiality agreement with respect to such information.

10. <u>Trustee Powers</u>. The Trustee, in addition to the specific powers set forth, hereinafter, shall have all the powers of a Trustee under the common law, as well as those specified under the Uniform Trustees Powers Act, including, but not limited to: the power to open a bank checking account in the name of the Trustee or to hold trust funds in his Client Trust Account at the Bank of Hawaii, the power to sell, hold title to property by mortgage, trust, deed of trust or pledge, the power to hold Trust Property in the name of a limited liability company and the power to insure Trust Property and obtain liability and other insurance with respect thereto and otherwise to take any measures he deems appropriate to collect, protect or expand the assets and income of the Trust Property. The Trustee shall have all the powers necessary to operate, manage, control, sell and/or otherwise dispose of the Trust Property for the benefit of the Exchange Creditors, to settle, adjust, compromise, and arrange all accounts, controversies, claims and demands in relation to the Trust, the Trustee and/or any Trust Property; including debts owed to or by Debtors and claims to, against or with respect to Trust Property, grant extensions and/or take security with respect to unsecured or partially secured debts owed to Debtors and/or unliquidated claims of Debtors, and/or abandon or not take title to Trust Property which is burdensome to the trust estate and/or distribute Trust Property to Exchange Creditors. Trustee shall take all actions which he shall deem necessary and proper to carry out such purposes. The Trustee, in his discretion, may contract with legal counsel, agents, or brokers at the expense of the Trust, while carrying out its provisions, and may pay them reasonable compensation for services out of the funds of the Trust in lieu of cash payments. The Trustee may, upon the request of any Exchange Creditor, obtain a fidelity bond at the expense of the Trust and shall obtain such fidelity bond upon the request of a majority vote of Creditors. The Trustee shall pay out of the funds of the Trust, all necessary and proper expenses and compensation incurred or earned in the performance of his duties and in the management of this Trust and Trust Property. The Trustee shall receive reasonable compensation as later provided herein and is hereby granted a security interest in all assets held by him as Trustee as security for the payment of his expenses and fees.

4

The Trustee may pay, compromise or contest any claim or other matter directly or indirectly affecting this Trust, and generally do all things in relation to the Trust Property which the Trustee could do if he was not Trustee and the Trust Property was not Trust Property, but was the Trustee's own property. The Trustee's determination as to the timing and calculation of distributions and/or the interpretation of this Trust Agreement shall be binding on all parties hereto unless clearly erroneous. The execution of any document or instrument by the Trustee shall be sufficient to bind the Trust.

11. <u>Adding Other Creditors To Trust Agreement With Approval of Exchange Creditors</u>. With the written approval of Exchange Creditors whose Creditor's Principal constitutes at least fifty percent (50%) of the total of the Creditor's Principal owed to all Exchange Creditors, the Trustee may (i) allow Thomas Leffler and/or Ronald Kotoshirodo, Chapter 7 Trustee, and/or other persons or entities who have claims against Debtors and/or to or against the Trust Property or this trust, to become parties to the Trust Agreement and/or (ii) enter into other agreements for said persons or entities to receive distributions of Trust Property, all on such terms and conditions as the Trustee may determine to be appropriate under the circumstances and which are approved by the Exchange Creditors as aforesaid.

12. <u>Exchange Accommodators, Inc. To Be Dissolved</u>. Trustee shall not be required or authorized to carry on the exchange or other business of Debtors. In that there is no longer any market value of the Debtors' business, Debtors shall file Articles of Dissolution of the Debtor with the DCCA of the State of Hawaii upon the written direction of the Trustee.

13. <u>Creditors' Rights Not Assignable</u>. The interest of any Exchange Creditor in the trust created hereby and/or with respect to any distributions payable in connection herewith, both principal and income, shall not be alienable, attachable or transferable, nor paid by way of anticipation or in compliance with any order, assignment or conveyance, and shall not be applied to or held liable for any of his or her debts or obligations, either in law or equity, and shall not in any event pass to him or her or to his assignee or trustee under assignment or under any insolvency or bankruptcy law, and shall not be subject to interference or control of creditors, spouses or others.

14. <u>Payment of Trust Expenses</u>. Trustee shall pay all costs, charges, fees, compensation and expenses of or incidental to the negotiations, preparation and execution of this agreement, the performance of the duties and obligations of Trustee as provided herein and of the carrying of the Trust Agreement into effect. Trustee shall receive compensation for his services provided as Trustee or to or for the benefit of the trust created hereby or the collection and protection of Trust Property, including the prior negotiations, preparation and execution of this Trust Agreement and of the bringing this Agreement into effect at Trustee's hourly rate of $250.00 per hour. It is further understood and agreed that in consideration Trustee's services and the risk that Trustee may not be paid if Debtors are involved in a bankruptcy proceeding or for other reasons and the fact that Trustee did not require a retainer or advance payment while much of his work, investigation, and effort to arrive at this Agreement has had to be been

5

performed in advance by the Trustee, Trustee shall receive as additional compensation three percent (3%) of all funds or other assets collected and/or distributed in accordance with this Agreement. All distributions hereinafter referred to shall be subject to prior or simultaneous payment of the Trustee's fees and expenses as provided herein.

15. <u>Limitation on Trustee's Compensation.</u>    Notwithstanding the foregoing paragraph 13 above, the compensation of the Trustee shall not exceed the sum of ten (10%) percent of all funds or other assets collected and/or distributed in accordance with this Agreement. Upon the removal or resignation of the Trustee as provided herein, the above stated three (3%) per cent compensation shall immediately due and payable to the extent of the amount of funds and/or other assets collected and/or distributed to that point, in addition to the amount owing for the services provided by the Trustee described in paragraph 14 above.

16. <u>Pro Rata Distributions to Creditors.</u>

A.    If all Exchange Clients elect to participate in this Trust Agreement (assuming no changes pursuant to paragraphs 3 or 11 herein), the respective percentages of the Creditor's Principal will be as follows:



| Exchange Creditor | Creditor's Balance | Percentage of Future Distributions Based on Creditor Balances |
|---|---|---|
| Collins | $ 300,000.00 | 10.3551% |
| Fang | $ 140,000.00 | 4.8324% |
| Miller/TLG | $ 105,622.15 | 3.6457% |
| Moriarty | $ 183,421.06 | 6.3311% |
| Patey | $ 554,909.04 | 19.1537% |
| Rigoli | $ 608,250.13 | 20.9949% |
| Wallace | $ 614,632.25 | 21.2152% |
| Wong | $ 390,301.44 | 13.4720% |
| TOTAL | $ 2,897,136.07 | 100.00% |

B.    The Trustee has heretofore and/or currently herewith made distributions pursuant to the original terms of the Trust Agreement to Wallace, Wong and Rigoli such that the total of the amount they have each received from Debtors, together with the distribution of Trust Property by the Trustee, now equals seventeen and one-half percent (17.5%) of the amounts received by Debtors from the sale of their respective relinquished properties. All subsequent distributions to Exchange Creditors shall be based on the respective Creditor's Balance owed to each Exchange Creditor.

C.    Upon execution of this Trust Agreement by each additional Exchange Client, and thereafter when and to the extent that the assets of the Trust are sufficient to do so, the Trustee shall next make distributions to the Exchange Creditors pro rata in proportion to the Creditor's Principal until all Exchange Creditors have received the Creditor's Principal owed to them.

D.    After all Exchange Creditors have received the Creditor's Principal owed to them, the Trustee shall, when and to the extent that the assets of the Trust are sufficient to do so, next make distributions to the Exchange Creditors pro rata in proportion to the interest, tax losses and attorney's fees owed to Exchange Creditors determined in accordance with paragraph 4 herein.

17.    <u>Additional Distributions In Lieu of Consequential and/or Punitive Damages</u>.    After each Creditor has received a distribution equal to the Creditor's Principal, interest, taxes and attorney's fees, the Trustee shall, when and to the extent that the assets of the Trust are sufficient to do so, make additional distributions to each Exchange Creditor pro rata according to the Creditor's Principal, according to the following schedule:

A.    For that portion of the Creditor's Principal repaid to each Exchange Creditor more than thirty one (31) but less than one hundred twenty one (121) days after the Effective Date:  twenty five percent (25%) of said Creditor's Principal not repaid as of the thirty first (31st) day. 

B.    For that portion of Creditor's Principal repaid to each Exchange Creditor more than one hundred twenty one (121) days but less than two hundred eleven (211) days after the Effective Date:  fifty percent (50%) of said Creditor's Principal not repaid as of one hundred twenty first (121st) day.

C.    For that portion of Creditor's Principal repaid to each Exchange Creditor more than two hundred eleven (211) days but less than three hundred and one (301) days after the Effective Date:  seventy five percent (75%) of said Creditor's Principal not repaid as of the two hundred eleventh (211th) day;

D.    For that portion of Creditor's Principal repaid to each Exchange Creditor more than three hundred and one (301) days after the Effective Date:  one hundred percent (100%) of Creditor's Principal not repaid as of the three hundred first (301st) day.

E.    It is expressly agreed and understood that the foregoing percentages are not cumulative.  By way of example:  if the Creditor's Principal were $200,000 and Trustee repaid $150,000 attributable to said Creditor's Principal one hundred (100) days after the Effective date and the remaining $50,000 attributable to said Creditor's Principal two hundred (200) days after the Effective Date, Creditor would be entitled to an additional distribution of $62,500 (i.e. $37,500 which is 25% of

$150,000 repaid 100 days after the Effective Date plus $25,000 which is 50% of the $50,000 repaid 200 days after the Effective Date).

18. <u>Distribution of Remaining Proceeds.</u> After all Exchange Creditors have received the amounts specified in paragraphs 16 and 17 hereinabove, the Trustee shall, when and to the extent that the assets of the Trust are sufficient to do so, make additional distributions to each Exchange Creditor pro rata according to the Creditor's Principal, according to the following schedule:

A. If an Exchange Creditor's Principal, interest, tax losses and attorney's fees are repaid more than three hundred and one (301) but less than three hundred sixty six (366) days after the Effective Date, then said Exchange Creditor shall receive a pro rata portion of fifty percent (50%) of all net remaining funds and assets and the remaining fifty percent (50%) shall be distributed to or as directed by Debtors;

B. If an Exchange Creditor's Principal, interest, tax losses and attorney's fees are repaid more than three hundred sixty six (366) days but less than four hundred fifty seven (457) days after the Effective Date, then said Exchange Creditor shall receive a pro rata portion of sixty two and one half percent (62½%) of all net remaining funds and other assets and the remaining thirty seven and one-half percent (37½%) shall be distributed to or as directed by Debtors;

C. If an Exchange Creditor's Principal, interest, tax losses and attorney's fees are repaid more than four hundred fifty seven (457) days but less than five hundred forty eight (548) days after the Effective Date, then said Exchange Creditor shall receive a pro rata portion of seventy five percent (75%) of net remaining funds and other assets, and the remaining twenty five percent (25%) shall be distributed to or as directed by Debtors;

D. If an Exchange Creditor's Principal, interest, tax losses and attorney's fees are repaid more than five hundred forty eight (548) days but less than six hundred thirty nine (639) days after the Effective Date, then said Exchange Creditor shall receive a pro rata portion of eighty seven and one-half percent (87½%) of net remaining funds and other assets and the remaining twelve and one-half percent (12½%) shall be distributed to or as directed by Debtors;

E. If Creditor's Principal, interest, tax losses and attorney's fees are not repaid within six hundred thirty nine (639) days after the Effective Date, then said Exchange Creditor shall receive a pro rata portion of all remaining funds and other assets.

19. <u>Nature of Payments.</u> Debtors and Exchange Creditors acknowledge and agree that all amounts which Creditors may receive pursuant to paragraphs 17 and 18 are in settlement of Creditors claims for general, consequential, punitive and/or other damages as a result of the actions of Debtors.

20.    <u>Forbearance by Creditors</u>.

A.    In consideration of Debtors execution and performance of this Agreement, each of the Exchange Creditors agrees not to file an involuntary bankruptcy proceeding against either Debtor or take any other action to collect the amounts owed by Debtors unless (i) Exchange Creditors have not received the Creditor's Principal amount owed to them within twelve (12) months of the Effective Date or (ii) Exchange Creditors have not received the Creditor's Principal, interest, tax losses and attorney's fees within twenty four (24) months of the Effective Date or (iii) Trustee notifies Exchange Creditors that Debtors are in material breach of their obligations under this Agreement.

B.    If either (i) an Exchange Creditor has not received the Creditor's Principal amount owed within twelve (12) months of the Effective Date, or (ii) an Exchange Creditor has not received the Creditor's Principal, interest, tax losses and attorney's fees within twenty four (24) months of the Effective Date or (iii) Trustee has notified Exchange Creditor that Debtors are in material breach of their obligations under this Agreement, said Exchange Creditor may withdraw as a party to this Trust Agreement and take any and all collection or other actions with respect to Debtors which said Exchange Creditor could have taken in the absence of this Exchange Agreement.

21.    <u>Release of Anderton Residence</u>.    If and when all Exchange Creditors have received a distribution equal to the amounts owed to Exchange Creditors pursuant to paragraphs 3 and 4 herein (i.e. the Creditors' Principal together with interest, tax losses and attorney's fees) on or before December 31, 2010 and Debtors are not then and have not been in material breach of their agreements and obligations set forth in this Trust Agreement, Trustee shall quitclaim title to Anderton's residence to Anderton and/or his designee.

22.    <u>No Retained Interest in Trust Property</u>.    This Trust Agreement and the trust created by it shall be irrevocable and the transfers hereunder shall be and are absolute and unconditional for the purposes provided herein.  Debtors do not reserve any domination or control over: (1) the Trust Property or the principal or income of the Trust Property; (2) the designation of any creditor, following the initial designation hereunder; or (3) the Trustee.

23.    <u>No Undisclosed Agreements or Relationships</u>.    Debtors and Trustee warrant and covenant that they do not now and will never have any secret or undisclosed agreements or arrangements of any kind, including but not limited to, any agreement that obligates the Trustee to act in any manner in the Debtors' interest, and not as a fair, unbiased, and independent fiduciary acting in the best interest of Exchange Creditors.  Debtors and Trustee further represent and warrant to Exchange Creditors that they have never been involved in any transactions of any) kind with each other and had never met or had any discussions of any kind with respect to any matter

whatsoever, prior to their first meeting on June 18, 2008 arranged by and at the request of the attorney for Jamie Wallace which concerned the details of this Trust Agreement.

24. <u>Limitation on Trustee's Liability</u>.   The Trustee shall not be liable for the acts, omissions or defaults, willful or otherwise, of any agent, nor for any error of judgment or loss from any act, omission or default of such Trustee himself made in good faith, nor for any cause other than the Trustee's own gross negligence or willful breach of trust.   Trustee shall have no power whatsoever to bind any Creditor personally, nor shall any Trustee be individually or personally liable in tort or on any written or other contract that the Trustee may enter into while carrying out this Trust, and the other party or parties to such contract or having any tort claims, debt, damage, judgment or decree that may otherwise become due and payable by reason of failure on the part of the Trustee to perform such contract in whole or in part or through the negligence, error or omission by the Trustee, shall be limited in recovery to the extent of the Trust Property.

25. <u>Amendment of Trust to Comply with Law</u>.   The Trustee shall have the power to unilaterally amend this Trust Agreement only if and to the extent necessary to conform to or comply with any controlling law, rule, regulation or order of any government body or to avoid having the Trust Property subject to the claims of any other creditors of Debtors not listed herein, provided, however, that such amendment may not be inconsistent with the basic Trust purposes and stated intent, nor in derogation of the fiduciary obligation of the Trustee to any Creditor nor materially and adversely affect the interest of any Exchange Creditor without said Exchange Creditor's consent. 

26. <u>Life Insurance</u>.   Anderton has in force and agrees to maintain in force a term life insurance policy having no cash value and a face value of five hundred thousand dollars ($500,000) which is being assigned to Trustee and the beneficiary changed to the Trustee.   In the event of Anderton's death during the term of this Trust, the face value of the policy shall be paid to Trustee and the proceeds thereof shall be distributed as provided herein.

27. <u>Anderton's Payment of Obligations</u>.   Unless otherwise instructed by Trustee, Anderton agrees to make all payments on debts secured by a mortgage or other encumbrance of Trust Property, and life insurance premiums on the life insurance policy referred to in paragraph 26 and all real property taxes owed with respect to Trust Property.   Anderton shall not be entitled to use Trust Property to make such payments but instead shall use his future income and/or funds borrowed from his wife or other third-parties to make all such payments.

28. <u>Election of Successor Trustee</u>.   In case of the death or resignation of the Trustee named, or upon any material breach of Trustee's duties or obligations, the Creditors may by majority vote to remove the Trustee and to elect another trustee to fill a vacancy so caused and thereupon the succeeding trustee shall become Trustee in the

place of the Trustee, and the said succeeding Trustee shall have the same rights, powers and duties as the original Trustee.

29. <u>Majority Vote of Creditors</u>. The term "majority vote of Creditors" as used in this Trust Agreement shall mean a majority in both number and amount owed by Debtors.

30. <u>Termination of Trust</u>. This trust shall continue until the earlier of (1) all Trust Property is sold or liquidated and all proceeds are distributed as provided herein or (2) Creditors have been paid all amounts as specified herein, in which event, Trustee shall convey all remaining assets to Anderton and/or his designee by appropriate conveyances and assignments without warranty or representations of any kind.

31. <u>Debtors' Ratification of Trustee's Acts</u>. Debtors ratify, confirm and agree with Trustee that they will, if and when required by the Trustee, ratify and confirm in writing whatever the Trustee shall do or purport to do by virtue of the powers given in this Trust Agreement.

32. <u>No Third-Party Beneficiaries</u>. Any provisions herein to the apparent contrary notwithstanding, it is expressly agreed that none of the obligations hereunder of any party hereto are intended to benefit, shall run to or to be enforceable by, anyone other than a party to this Trust Agreement.

33. <u>Severability</u>. If any term, covenant, condition or provision of this Agreement shall be invalid or unenforceable, the reminder of this Agreement shall not be affected thereby, and each term, covenant, condition and provision shall be valid and enforced to the fullest extent permitted by law.

34. <u>No Interpretation Against Drafter</u>. The parties hereto acknowledge that each of them has had an opportunity to review this Trust Agreement and consult with counsel prior to the execution thereof and that this Trust Agreement shall not be construed against any party because that party prepared it.

35. <u>No Partnership or Other Relationship</u>. Nothing contained in this Trust Agreement nor the discussions leading to the creation hereof, shall create between the parties hereto, or be relied on by others as creating, any relationship of partnership, association, joint venture, attorney-client or other relationship. All parties hereto acknowledge and agree that Trustee has not provided legal advice or services to any of the parties hereto nor in any way represented any of the parties hereto at any time. All parties acknowledge that Trustee intends to act strictly as a neutral fiduciary and not to have an attorney-client or other relationship with any of the parties hereto. No party to this Trust Agreement is entitled to or will rely on any statements or actions of Trustee as creating an attorney-client relationship in the absence of a written retention agreement with Trustee.

36. <u>Integration</u>.    This Trust Agreement, including the Exhibits which are attached hereto and by this reference are incorporated herein, is and shall be considered to be the only agreement between the parties hereto.  All negotiations, prior understandings and oral agreements have been merged into and included herein, and shall not be effective for any purpose except as contained herein.   There are no outstanding oral agreements between the parties hereto affecting the subject matter of this Trust Agreement which supersedes and cancels any and all previous negotiations, arrangements, agreements and understandings, if any, between the parties hereto with respect to the subject matter hereof, and none of such matters will be used to interpret or construe this Trust Agreement.  There are no representations or warranties between or amongst the parties other than those contained in this Trust Agreement.  Except as otherwise expressly provided herein, no provision of this Trust Agreement may be amended except by an agreement in writing signed by the parties hereto or their respective successors in interest.

37. <u>Counterparts</u>.    This Trust Agreement may be executed in counterparts, each of which is deemed an original, and such counterparts constitute one and the same instrument, which may be sufficiently evidenced by a counterpart.  A facsimile, telecopy, *pdf*, or other reproduction of this Trust Agreement may be executed by one or more parties, and an executed copy of this Trust Agreement may be delivered by one or more parties by facsimile, *pdf* e-mail, or similar instantaneous electronic transmission device under which the signature of or on behalf of such party can be seen, and such execution and delivery is to be considered valid, binding and effective for all purposes.  At the request of any party, the parties agree to execute an original of this Trust Agreement as well as any facsimile, telecopy or other reproduction hereof.

38. <u>Dispute Resolution</u>.    Any claim arising out of or relating to the provisions of this Trust Agreement, or the alleged breach thereof, shall first be submitted to mediation by a mediator selected by the parties, or if the parties cannot agree on a mediator, the mediator shall be appointed by Dispute Resolution Inc.  If the parties are unable to resolve any claim through mediation, the claim shall settled by arbitration by a single arbitrator in the City and County of Honolulu, State of Hawaii, in accordance with the then applicable governing rules of Dispute Resolution, Inc.  The arbitrator shall award attorney's fees and costs to the prevailing party or parties.  Judgment upon the award rendered by the panel of arbitrators may be entered and enforced in any court of competent jurisdiction.  Notwithstanding any other provision of this Trust Agreement, all claims of any kind or nature against Trustee, the Trust Property or the trust created by this Trust Agreement by any Exchange Creditor shall be waived and released unless submitted in writing to Trustee within thirty (30) days after said Exchange Creditor is notified in writing of Trustee's intention to make a final distribution of all Trust Property.

39. <u>Notices</u>.    Unless otherwise specified by an Exchange Creditor or Trustee, all notices and other communications may be sent by e-mail at such e-mail addresses, with copies to such persons, as specified by said Exchange Creditor or Trustee.

40.   <u>Headings</u>.   The paragraph headings contained herein are for convenience of reference only and are not intended to define, limit or describe the scope or intent of any provisions of this Trust Agreement.

IN WITNESS WHEREOF the parties set forth their hands and seal this date first written above.

EXCHANGE ACCOMODATORS, INC.


By _Jon F. Anderton_____
   Its President


_Jon F. Anderton_____
JON F. ANDERTON, individually

   "Debtors"


_____
JERRY RUTHRUFF

   "Trustee"


_____
JAMIE WALLACE

   "Wallace"

40.  Headings.  The paragraph headings contained herein are for convenience of reference only and are not intended to define, limit or describe the scope or intent of any provisions of this Trust Agreement.

IN WITNESS WHEREOF the parties set forth their hands and seal this date first written above.

EXCHANGE ACCOMODATORS, INC.


By_____
   Its President



_____
JON F. ANDERTON, individually

   "Debtors"



_____
JERRY RUTHRUFF

   "Trustee"


_____
JAMIE WALLACE

   "Wallace"

The undersigned persons/entities subscribe and agree to be parties to the
above Trust Agreement:

Th9 Enterpises

Signature: _Raymond Miller_         Date: _1-6_, 200_9_
Printed Name: _RAymond Miller_
General Partner

Signature:_____         Date: _____, 200_
Printed Name:_____

Signature:_____         Date: _____, 200_
Printed Name:_____

Signature:_____         Date: _____, 200_
Printed Name:_____

14

The undersigned persons/entities subscribe and agree to be parties to the above Trust Agreement:

Signature: _Ming Fang_      Date: _1/14_, 200_9_
Printed Name: _Ming Fang_

Signature:_____      Date: _____, 200_
Printed Name:_____

Signature:_____      Date: _____, 200_
Printed Name:_____

Signature:_____      Date: _____, 200_
Printed Name:_____

To Jerry Ruthroff     FAX 808441-1970

The undersigned persons/entities subscribe and agree to be parties to the above Trust Agreement:

Signature: _____     Date: _____, 200_
Printed Name: VANCE P. COLLINS

Signature:_____     Date: _____, 200_
Printed Name:_____

Signature:_____     Date: _____, 200_
Printed Name:_____

Signature:_____     Date: _____, 200_
Printed Name:_____

14

## Exhibit "A"
### (Jon F. Anderton's List of Assets With Value in Excess of $10,000)

| | Estimated Value per Anderton (gross value, w/o deducting encumbrances) | Mortgage |
|---|---|---|
| Investment in Mid Pacific Communications, Inc.("MPC") (605,300 shares valued @ $5.00 per share) (Note: 153,275 shares are pledged pledged to Oliver) | 3,476,500 | |
| Investment-IZA, LLC (290,000 MPC shares held for Anderton's bi | 1,450,000 | |
| Investment-KOAMPC, LLC (71,875 MPC shares held for Anderto | 359,375 | |
| Investment-Hawaii Shared Ownership, Inc. Fractional Sales DevE (List price for five unsold 1/6th interests less 7% sales costs) | 674,250 | 357,000 |
| Residence - Anahola Kauai TMK (4)-4-9-002-001-0004 (4-4881 -J Kuhio Highway, Anahola, HI 96703) | 1,000,000 | 1,000,000 |
| Vacant Land - approx 2 acres TMK (4)-4-9-003-005 (5223 Aliomanu Rd., Anahola, HI 96703) | 225,000 | |
| Vacant Land - 2.217 acres TMK (4)-2-3-002-018-003 (Waha Rd., Kalaheo, HI) | 225,000 | 170,000 |
| Vacant Land - 1.091 acres TMK (3)-1-3-028-039 (Leilani Subdivision, Island of Hawaii) | 40,000 | |
| Receivable - Thomas Lefler* (Disputed) | 489,842 | |
| Receivable - Brian Hennessy | 40,000 | |
| Vacant Land - San Bernadino County California | 15,000 | |
| **Claim against James Lull (amount of claim is $5,670,606; estimated value may be $0)** | unknown | |

\* Lefler is apparently now contending that his purchase of the one -half interest in the Molokai property owned by Hawaii Shared Ownership, Inc. ("HSO") was never consummated, which if true, should mean that HSO owns 100% of the Molokai property which has a value of approximately $700,000, (see Lefler complaint for more details).



**Exhibit "A"**
(Page 2)

** Upon payment of $320,000 to obtain release of mortgage which encumbers property previously conveyed to Oliver, the pledge of the 153,275 shares of MPC stock and the mortgage on the two properties will be released)

The undersigned persons/entities subscribe and agree to be parties to the above Trust Agreement:

Signature: _Solar Wong_        Date: _1/15_, 200_9_
Printed Name: _Solar Wong_

Signature: _Douglas Wong_        Date: _1/15_, 200_9_
Printed Name: _D. DOUGLAS WONG_

Signature: _____        Date: _____, 200_
Printed Name: _____

Signature: _____        Date: _____, 200_
Printed Name: _____

14

# SETTLEMENT AGREEMENT

This Settlement Agreement is entered into this _____ day of February, 2010, by and between (i) Robert Patey and (ii) JAXA HOLDINGS, LLC and JERRY A. RUTHRUFF (individually and as Trustee of the Amended and Restated Trust Agreement dated December 31, 2008 which document is attached to this Settlement Agreement as Exhibit "A"), with reference to the following:

    A.  At all times relevant hereto, Exchange Accommodators, Inc. ("EAI") was engaged in the business of acting as an exchange intermediary for real estate transactions intended to qualify as tax deferred exchanges pursuant to Section 1031 of the Internal Revenue Code;

    B.  Pursuant to the terms of the exchange agreements that EAI entered into with its customers, EAI was required (i) to deposit and hold the funds it received from the sale of its customer's relinquished properties (hereinafter referred to as "Exchange Proceeds") in a federally insured bank account, (ii) to use each customer's Exchange Proceeds solely for the purchase of replacement property designated by that customer and (iii) if and to the extent that the customer did not use all of his/her Exchange Proceeds for the purchase of replacement properties, to pay any unexpended portion of a customer's Exchange Proceeds to that customer.

    C.  In 2007 and 2008, contrary to and in violation of the express terms of said exchange agreements, EAI and Jon Anderton ("Anderton"), the president, general manager and sole owner of EAI, were using most or all of the Exchange Proceeds received from the sale of Patey's and their other customers' relinquished properties, for unauthorized purposes and were therefore unable to fulfill EAI's obligations to use Patey's and their other customers' Exchange Proceeds for the purchase of replacement property designated by that customer and/or to pay the unexpended portion of said Exchange Proceeds to Patey and their other customers to the extent

# EXHIBIT B

that Patey and their other customers did not use all of his/her Exchange Proceeds for the purchase of replacement properties.

D. On or about December 31, 2008, EAI and Anderton entered into the Amended and Restated Trust Agreement ("Trust Agreement, which is attached hereto as Exhibit "A") with (i) Jerry A. Ruthruff as Trustee ("Ruthruff") and (ii) Jamie Wallace, Vance Collins, TLG Enterprises, Andre Rigoli, Ming Fang, and Solar Wong/Douglas Wong as Exchange Creditors.

E. Pursuant to the Trust Agreement, substantially all of the assets of EAI and Anderton were transferred to Ruthruff, as Trustee and/or to Jaxa Holdings, LLC, a limited liability company formed by Ruthruff as Trustee to hold trust assets.

F. On July 15, 2009, the Circuit Court of the Fifth Circuit entered its "Order Granting in Part and Denying In Part Plaintiff Robert Patey's Motion For Summary Judgment" in which Patey was awarded damages in the amount of $554,909.04 (principal amount), together with prejudgment interest of $103,228.28 as of June 9, 2009 together with attorneys' fees and costs.

G. On July 21, 2009, Patey, Anderton and EAI entered into the "Stipulated HRCP 4(B) Final Judgment for Monetary Damages, Attorneys Fees' Costs and Interest" ("Patey's Stipulated Judgment") in the total amount of $784,262.05 plus interest of $152.03 from June (, 2009, which includes principal of $554,909.54, interest of $103,228 through June 9, 2009 and attorneys' fees and costs totaling $126,124.70.

H. On August 12, 2009, Patey filed Civil No. 09-0215 in the Circuit Court of the Fifth Circuit against Jerry A. Ruthruff ("Ruthruff") and Jaxa Holdings, LLC ("Jaxa") contending that the transfer of assets to Jaxa, et al. were fraudulent transfers as defined by Chapter 651-C, Hawaii Revised Statutes.

2

I. On October 27, 2009, Judge Watanabe orally granted Patey's Motion for Summary Judgment wherein Patey sought, *inter alia*, an order voiding the transfer of assets by EAI and Anderton to Ruthruff and Jaxa.

J. On November 15, 2009, Jaxa filed a petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court of the United States District Court for the District of Hawaii, Case No. 09-2660.

K. Pursuant to the Trust Agreement, as of December 31, 2009, the principal amounts owed to Linda Moriarty and the six Exchange Creditors who have joined the Amended and Restated Trust Agreement, were as follows:

| | |
|---|---|
| Vance Collins | $ 290,680.45 |
| Ming Fang | $ 135,650.88 |
| Andre Rigoli | $ 589,354.74 |
| Douglas & Solar Wong | $ 378, 176.66 |
| TLG Enterprises/ Miller | $ 102,340.98 |
| Jamie Wallace | $  595,538.60 |
| TOTAL | $2,091,742.31 |
| Linda Moriarty | $ 183,421.06 |

L. On November 18, 2008, Ronald Kotoshirodo, as trustee of the estate of James Lull ("Kotoshirodo"), filed an Amended Complaint in Adv. Proc. No. 08-90072 in the Bankruptcy Court of the United States District Court for the District of Hawaii against Anderton, EAI, Ruthruff, et al. wherein he claims, *inter alia*, that Anderton and/or EAI received fraudulent transfers totaling $2,294,195 from James Lull within the meaning of Section 548 of the Bankruptcy Code and/or Chapter 651C of the Hawaii Revised Statutes and that the transfer of

assets from Anderton and EAI to Ruthruff and Jaxa were fraudulent transfers within the meaning

of Section 548 of the Bankruptcy Code and/or Chapter 651C of the Hawaii Revised Statues.

M. Ruthruff has an agreement in principle and intends to settle the Adversary Proceeding

by treating Kotoshirodo as being owed $500,000 by EAI and Anderton and to make distributions

to Kotoshirodo and Moriaty pari passu with the Exchange Creditors and Patey pursuant to the

Terms of the Trust Agreement and this Settlement Agreement.

N. Jaxa is the registered owner of 452,025 shares of Mid-Pacific Communications,

Inc. ("MPC") as evidenced by stock certificate number 123. Jaxa and/or Ruthruff have an

indirect interest in additional shares of MPC which are owned by IZA, LLC and KOA

MPC, LLC but do not own or have access to said shares at the present time because said

limitied liability companies are managed and controlled by the management of MPC.

NOW THEREFORE, Patey, Ruthruff and Jaxa agree as follows:

1. Upon Closing, Jaxa and Ruthruff will return the original stock certificate

number 123 for 452,025 shares of Mid-Pacific Communications, Inc. ("MPC"), to MPC

common stock and instruct MPC to issue replacement certificates as follows: (i) 89,070

shares to Patey and (ii) 335,995 shares to Jaxa. Upon receipt of the replacement certificates,

Jaxa and Ruthruff will deliver the original certificate for 89,070 shares of MPC to Patey.

2. For purposes of calculating the value of the 89,070 shares of MPC to be

received by Patey and the remaining amounts owed to Patey, the 89,070 shares shall be

valued at the average amount per MPC share subsequently received by Jaxa and/or Ruthruff

from the sale of the MPC shares or other liquidation of the indirect interest in the shares of

MPC owned by Jaxa and/or Ruthruff by way of the membership interest in IZA, LLC and

KOA MPC, LLC. Notwithstanding any other provision of this agreement, Patey shall not

be entitled to receive any subsequent distributions which arise from the sale or other

liquidation of the 386,632 shares of MCP which will be owned by Jaxa after 89,070 shares are distributed to Patey. If within 24 months of the Closing, Ruthruff and/or Jaxa have not sold or otherwise liquidated their interest in the remaining shares of MPC stock, the Parties hereto agree for purposes of this Settlement Agreement that MPC shares shall be valued at one dollar ($1.00) per share. Patey shall have the right to participate, at his option, in any bulk sale of the stock arranged by Ruthruff within 24 months of the Closing by contributing his pro rata share of the stock to the sale in exchange for his pro rata share of the purchase price.

3. Except as provided in paragraphs 1 and 2 hereinabove, from and after the Closing, Ruthruff and Jaxa agree to distribute the proceeds from the sale or collection of the assets of EAI and Anderton which were transferred to Ruthruff, as Trustee and/or to Jaxa, to Patey, the Exchange Creditors, Moriarity and Kotoshidoro *pari passu* in the respective percentages listed below, as if Patey had become a part to the Trust Agreement, and until Patey has received $681,034.64:

| | | | |
|------|----------------------|------------------|-------------|
| (A) | Exchange Creditors: | $ 2,091,742.31 | (60.52%) |
| (B) | Moriarity: | $ 183,421.06 | ( 5.31%) |
| (C) | Patey: | $ 681,034.64 | (19.70%)[1] |
| (D) | Kotoshidoro | $ 500,000.00 | (14.47%) |
| | TOTAL: | $ 3,456.198.01 | (100.00%) |

4. After the Closing, Ruthruff and Jaxa agree to provide an Accounting of the assets

---

[1] The Parties hereto recognize that Patey's judgment of $784,262.05 includes interest on the amounts owed to him whereas the amounts listed as being owed to the other creditors do not include interest. If the proceeds from the sale or collection of the assets of EAI and Anderton which were transferred to Ruthruff, as Trustee and/or to Jaxa are sufficient to make distributions totaling $3,456,198.01, then additional distributions will be made pro rata to Patey and other creditors towards the amounts owed to them for interest at ten percent (10%) per annum calculated from the date that EAI/Anderton received each creditor's funds, until Patey has received $784,262.05 plus post-judgment interest.

held and payments made with respect to the Trust Agreement and this Settlement Agreement to Patey at least every six months. In the event that said Accounting shows that Ruthruff and/or Jaxa are holding assets (other than direct or indirect interests in MPC stock) but have not made a distribution to Patey within the 6 months covered by the Accounting, Ruthruff shall provide a written explanation to Patey as to why a distribution has not been made. In the event that the Patey finds the written explanation to be unsatisfactory, the parties agree to submit the issue as to whether a distribution should be made to binding arbitration with a mutually agreed upon arbitrator subject to the rules of Dispute Prevention and Resolution of Hawaii. In making his or her decision, the arbitrator may balance then-existing market conditions against the fact that time is of the essence in completing the distributions as set forth in Paragraph 3 of this Settlement Agreement.

5. Upon the closing, Patey shall dismiss Civil No. 09-0215 without prejudice and shall not assert any new claims against Ruthruff and/or Jaxa except with respect to any material-breaches of their obligations hereunder.

6. Patey shall not take any additional actions (other than those set forth in Paragraph 4) to collect amounts owed to him from tangible, intangible or other assets now directly or indirectly owned by Anderton and/or EAI (collectively referred to as "Assets") and/or from Assets which were or should have been transferred or conveyed by Anderton and/or EAI to Ruthruff as trustee, so that Ruthruff can collect and distribute all Assets of Anderton and EAI pursuant to the Trust Agreement and this Settlement Agreement.

7. If and to the extent that Patey is aware or becomes aware that Anderton and/or EAI now have any interest in any Assets which, pursuant to the terms of the Trust Agreement, should have been transferred or conveyed by Anderton and/or EAI to Ruthruff as trustee, Patey shall disclose the full details of same to Ruthruff, and Ruthruff shall, to the extent

6

reasonable under the circumstances, use his best efforts collect and distribute said assets pursuant to the Trust Agreement and this Settlement Agreement. The provisions of this Paragraph 7 are subject to the arbitration procedures set forth in Paragraph 4 in the event that the Parties disagree as to whether a known asset should be collected and distributed.

8. The Closing of this Settlement shall occur as possible after (i) the entry of an order dismissing Jaxa's Chapter 11 proceeding and (ii) the closing of the sale of the Molokai property which is the subject matter of and subject to the Notice of Pendency of Action filed in, Civil No. 08-1-0653-03, *Thomas Leffler vs. Exchange Accommodators, Inc.* for $325,000 less closing costs. If for any reason Closing cannot take place on or before March 31, 2010, any party may elect to withdraw from this Settlement Agreement.

9. No later than five (5) business days after Closing as defined hereinabove, Ruthruff and/or Jaxa shall distribute to Patey 19.70% of the amount received from the closing of the sale of the Molokai property (provided that the sale is for no less than $325,000.00) which is the subject matter of and subject to the Notice of Pendency of Action filed in, Civil No. 08-1-0653-03, *Thomas Leffler vs. Exchange Accommodators, Inc.* for $325,000 less 19.70 % of closing costs.

10. It is understood and agreed that this settlement is the compromise of disputed claims and is not deemed or construed as an admission of liability of the Parties hereto, who intend merely to avoid litigation and buy their peace.

11. This Agreement shall be (i) governed by, interpreted under, and construed and enforced in accordance with the internal laws of the State of Hawaii, and (ii) subject to the exclusive jurisdiction of the Courts of the State of Hawaii, and each of the Parties hereby irrevocably submits to such jurisdiction.

12. Time is of the essence in this Agreement as to all dates, time periods and

7

completion of distributions set forth herein.

13. Each Party to this Agreement acknowledges: (i) this Agreement and its reduction in final written form is the result of extensive good faith negotiations, (ii) the Parties and their respective representatives have carefully reviewed and examined this Agreement prior to execution by such Parties, (iii) any statutory rule of construction that ambiguities are to be construed against the drafting party shall not be employed in the interpretation of this Agreement. The terms and conditions of this Agreement have been negotiated at arms length among knowledgeable Parties, represented by experienced legal counsel. As a result, the rule of "interpretation against the draftsman" shall not apply in any dispute over the interpretation of the terms and conditions of this Agreement.

14. Each of the undersigned represents and warrants that he/she has the authority to bind the entity for which he/she is executing this Agreement.

15. In the event Ruthruff and/or Jaxa fails to timely make the distribution to Patey required under paragraph 9 of this Agreement, this Agreement is void and without effect, and the Parties will return to the status quo ante.

16. The Parties agree that the execution of this Agreement by timely counterpart copies and by way of facsimile or e-mail signatures are binding and acceptable.

17. The Parties mutually release each other (and the officers, directors, and employees of each) from any and all claims, known or unknown, having to do with, arising from, related to, or which could have been pled in Civil No. 09-0215, Civil No. 09-1-0020, any other litigation referenced in this Settlement Agreement, and/or having to do with, arising from, or related to the facts giving rise to this Settlement Agreement, from the beginning of time to the execution of this Settlement Agreement.

18. The parties acknowledge and agree that so long as Jaxa is in Chapter 11, this

Document ID: 461787_1_MTY

Agreement is not binding on Jaxa until and unless it is approved by the Bankruptcy Court.

IN WITNESS WHEREOF, this Settlement Agreement has been duly executed

this _____ day of February, 2010.

ROBERT FATEY

JERRY A. RUTHRUFF

JAXA HOLDINGS, LLC.

By
It's Manager

9

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>JAXA HOLDINGS, LLC,<br>a Hawaii limited liability company,<br><br>        Debtor and<br>        Debtor-in-possession | Case No.  09-02660<br>(Chapter 11)<br><br>Date:<br>Time:<br>Judge:  Hon. Robert J. Faris |

## <u>DECLARATION OF JERRY A. RUTHRUFF</u>

I, JERRY A. RUTHRUFF, hereby declare that, if called as a witness in this action, I could and would testify competently of my own personal knowledge, and under penalty of perjury, as follows:

1.    I am licensed practice law in the State of Hawaii.  I am the manager and Trustee of Jaxa Holdings, LLC, the debtor and debtor-in-possession herein (the "Debtor").

2.    I make this Declaration in support of the Debtor's Motion to Dismiss Chapter 11 Case (the "Motion").  Terms used herein and not otherwise defined shall have the meaning given to them in the Motion.

3.     I have reviewed the facts set forth in the Motion, including but not limited to factual assertions made with respect EAI, Anderton, the Trust Agreement and the Patey Settlement.  These facts are true and correct to the best of my knowledge, information, and belief.

4.     Attached to the Motion as Exhibit "A" is a true and correct copy of the Trust Agreement.

5.     Attached to the Motion as Exhibit "B" is a true and correct copy of the Patey Settlement.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  Honolulu, Hawaii, February 19, 2010.


/s/ Jerry A. Ruthruff
JERRY A. RUTHRUFF